IN THE UNITED STATES COURT OF FEDERAL CLAIMS

_____

No. 08-195 T
(Judge Lettow)

DOMINION RESOURCES, INC.,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

_____

**CROSS-MOTION OF THE UNITED STATES FOR SUMMARY JUDGMENT
AND OPPOSITION OF THE UNITED STATES TO PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT**

_____

JOHN A. DiCICCO
  Acting Assistant Attorney General

STEVEN I. FRAHM
MARY M. ABATE
CARL D. WASSERMAN
  Attorneys
  Justice Department (Tax)
  Court of Federal Claims Section
  P.O. Box 26
  Ben Franklin Post Office
  Washington, D.C.  20044
   (202) 307-6587
   (202) 514-9440 (facsimile)

**TABLE OF CONTENTS**

Cross Motion of the United States…………………………………………………………viii

Brief of the United States in Support of Its Cross-Motion
for Summary Judgment and In Opposition to Plaintiff's
Motion for Summary Judgment……………………….……………………………………..1

    Questions Presented………………………………………………..……………2

        1………………………………………………………………………2

        2………………………………………………………………………2

        3………………………………………………………………………2

    Introduction………………………………………….……………………………...…..3

        A.  The Tax Reform Act of 1976 - New Code § 189
           Denies to Individuals Some Interest Deductions
           Formerly Allowed Under § 163……………………………………….…4

        B.  TEFRA 1982 - Code § 189 Is Applied to
           Corporations as Well……………………………………………….………5

        C.  The Tax Reform Act of 1986 - New Code § 263A
           Requires Capitalization of All Direct and Allocable
           Indirect Construction Period Costs…………………………...……………6

    Factual Background of This Case………………………………………………..10

    Argument I…………………………………………………………………13

    Treasury Regulations  § 1.263A-11(e)(1)(ii)(B) Is Valid………..…...……………13

        A.   The Standard to Be Applied by the Court in this Case…………..…13

        B.  The Statutory Scheme…………………………………………...16

        C.  FASB Statement No. 34: A Comprehensive
           Approach to Capitalization of
           Construction-Related Interest, and the
           Avoided Cost Concept……………………………….…………………18

        D.  Treasury's Regulatory Scheme…………………………...…………20

i

1. Avoided cost method –
   Treas. Reg. § 1.263A-9…………………………….……………21

2. Accumulated production expenditures –
   Treas. Reg. § 1.263A-11(a)…………………………....……..22

3. Unit of property –
   Treas. Reg. § 1.263A-10………………………………………24

E. Plaintiff's Position Regarding the
   Associated Property Regulation
   Requires Revision of the Language
   of the Statute…………………………………………….…...……25

   1. The "property produced" is the "unit
      of property," *not* the "improvement,"
      and interest on the entire adjusted basis
      during the production period must be
      capitalized…………………………………………...……25

      a. Interest is capitalized on the
         production of "property," not DRI's
         self-styled production of an
         "improvement"………………………...………………26

         (i)    The adjusted basis of the entire
                unit of property must be taken into
                account, to properly capture avoided
                costs………………………………..………………26

         (ii)   Use of the entire adjusted basis
                promotes tax parity…………………………….…..30

         (iii)  DRI's depreciation example
                demonstrates further fallacies
                in DRI's approach to the avoided
                cost concept……………………………………...…31

      b. Even under DRI's misconception
         of the "property produced" as
         separate from the "improvement,"
         the legislative history supports
         capitalizing interest on the
         associated property……………………………………...…32

ii

2. Section 263A Requires Capitalization of
Avoided Interest *Costs*, not *Expenditures*…………………..……33

3. The property-used-to-produce-property
rule *confirms* that associated property
costs must attract capitalized income……………………..……37

F. The Associated Property Regulation
Was Not Adopted in an Arbitrary and
Capricious Manner………………….……………………………..……39

Argument II………………………………………………………………………41

The De Minimis Rule Does Not Apply………………………………………41

Argument III……………………………………………………………………..43

The Calculation of the Amount of Interest
Required to Be Capitalized Under § 263A
Mistakenly Omitted A Portion of the
Adjusted Bases of the Possum Point and
Mount Storm Units; Defendant Is Thus
Entitled to Judgment For the Resulting
Erroneous Refund of Tax and Interest For
1996……………………………………………………...………………………43

Conclusion………………………………………………………………….……………45

Appendix A:

Internal Revenue Code of 1986 (26 U.S.C.):

§ 163(a)………………………………………………….....…..…………….A-1
§ 189………………………………………………………......…A-1, A-14, 15
§ 263A(a) ……………………………………………………………….A-1
§ 263A(a)(1)………………………………………………………….A-1
§ 263A(a)(2) ……………….....………………………………………A-1
§ 263A(b)(1) …………………………………………………..……..A-1
§ 263A(c)(1) ………………………………………………………...A-1, 2
§ 263A(f) …………………………………………….....……………...A-2
§ 263A(f)(2)(ii) ……....………………………………...........……………..A-2
§ 263A(f)(3) ……....…………………………………….....…………..A-3
§ 263A(f)(4)(B) …....……………………………….…....…………...A-3
§ 263A(f)(4)(C) …....………………………………....…....…………...A-3

5688938.1

§ 263A(g) …..…………………………………………...…………………......…….…A-3
§ 263A(i) …..…………………………………………………...…………........…A-3

Treas. Reg.

§ 1.263A-8………………………………………………………...…………...........A-4
§ 1.263A-8(a)(2)…………………………………………………………...….........A-4
§ 1.263A-8(b)(2)(iii)……………………………………………………....…..........A-4
§ 1.263A-8(d)(3)(i)…………………………………………………………............A-5
§ 1.263A-9…………………………………………………………………...….......A-5
§ 1.263A-9(a)(1)……………………………………………………………............A-5
§ 1.263A-10………………………………………………………………........A-5, 6
§ 1.263A-10(a)……………………………………………………....…...…...........A-6
§ 1.263A-10(b)(1)…………………………………………………………...…........A-6
§ 1.263A-10(b)(2)…………………………………………………………...…........A-6
§ 1.263A-11(a)…………………………………………………………….........A-6, 7
§ 1.263A-11(d)……………………………………………………………….…......A-7
§ 1.263A-11(e)(1)……………………………………………………………...........A-8
§ 1.263A-11(e)(1)(ii)(B)…………………………………………………....…........A-8
§ 1.263A-11(e)(2)……………………………………………………………...........A-8
§ 1.263A-12…………………………………………………A-9, 10, 11, 12, 13

Appendix B:

Declaration of Carl Wasserman……………………………………………...…….B-1

Exhibit1:

Exhibit2:

**Page**

5688938.1

# TABLE OF AUTHORITIES

**Cases:**

*Abbott Laboratories* v. *United States*, 84 Fed. Cl. 96, 109 (2008)
(internal citation omitted), *aff'd*, 573 F.3d 1327 (Fed. Cir. 2009)………………………40

*American Standard, Inc. v. United States*, 602 F.2d 256, 220 Ct.Cl. 411 (1979)……….40

*Bowman Transportation, Inc.* v. *Arkansas-Best Freight System,
Inc.*, *supra*,  at 419 U. S. 286……………………………………………………………….40

*Camp* v. *Pitts*, 411 U. S. 138, 411 U. S. 142-143 (1973)………………….……………40

*Chevron U.S.A., Inc.* v. *Natural Resources Defense Council,]
 Inc.*, 467 U.S. 837, 842 (1984)……………………………………………….....……14, 15

*Commissioner* v. *Idaho Power*, 418 U.S. 1 (1974)………………………….….……….34, 78

*Dow Corning Corp. v. United States*, 22 Cl.Ct. 184, 192 (1990)…………………..……40

*Gen. Elec. Co.* v. *United States*, 251 F.3d 976, 979 (Fed. Cir. 2001)…………………...18

*Northern Colorado Water Conservancy Dist.* v.
*United States*, 88 Fed. Cl. 636, 659 (2009)……………………………………….………..15

*SEC v. Chenery Corp*., 318 U.S. 80, 94, 63 S.Ct. 454, 462, 87 L.Ed. 626 (1943)………40

**Statues:**

Internal Revenue Code of 1986 (26 U.S.C.):

§163(a)……………………………………………………...………………4
§ 189………………………………………………………….….………*Passim*
§ 263A(a) ……………………………………………..……22, 28, 38
§ 263A(a)(1)……………………………………………………………3
§ 263A(a)(2) ……………………………….…………………………3
§ 263A(b)(1) …………………..………………………………….………3, 26
§ 263A(c)(1) ……………………..………………………………...…………23
§ 263A(f) …………………………………………….........…………*Passim*
§ 263A(f)(2)(ii) …….…..…………………………….......…………33
§ 263A(f)(3) ……..………………………………….........…37, 38
§ 263A(f)(4)(B) …..……………………………….…..….......…………17, 28
§ 263A(f)(4)(C) …..…………………………….…....….........……17, 28, 33
§ 263A(g) …..……………………………….....…..........……16, 22, 26
§ 263A(i) ….…..……………………………….....…..…………........…3, 13, 18, 39

**Miscellaneous:**

Tax Reform Act of 1976…………………………………………………………..……3

H.R. Rep. No. 658, 94th Cong., 2d Sess. 31 (1976)………………………………………..4

H.R. Conf. Rep. No. 1515. 94th Cong., 2d Sess. 408 (1976)……………………………4

Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA)…………………..………5

S. Rep. No. 494 (Part II), 97th Cong., 2d Sess. 128 (1982)………………………..………5

H.R. Conf. Rep. No. 760 (Part II) at 483……………………………………………….……5

H.R. Conf. Rep. No. 760 (Part II), 97th Cong., 2d Sess. 484-85 (1982)……………5, 33

H.R. Rep. No. 426, 99th Cong., 1st Sess. 625 (1986)…………………………………6, 7

Internal Revenue Service Non Docketed Service Advice
Review, 1988 IRS NSAR 8414, 1988 WL 1092583 (IRS NSAR)
(January 22, 1988)…… ………………………………………………………….….…..6

S. Rep. No. 313, 99th Cong., 1st Sess. 140 (1986)…………………………….....…6, 8, 14

H.R. Rep. No. 426, at 615………………………………………………………….6, 7

H.R. Conf. Rep. No. 841 (Part II), 99th Cong., 1st Sess. 309 (1986)………………..…10

FASB Statement No. 34: A Comprehensive Approach to
Capitalization of Construction-Related Interest, and the
Avoided Cost Concept…………………………………………………………..…Passim

56 FR 40842-01, 1991 WL 1565988 (F.R.)………………………………………………..20

1995 IRB LEXIS 1822 at *14-15………………………………………………………18, 32

Treas. Reg.

§ 1.263A-8……………………………………………………...…………10, 11
§ 1.263A-8(a)(2)…………………………………………………………………38
§ 1.263A-8(b)(2)(iii)…………………………………………………..…………42
§ 1.263A-8(d)(3)(i)……………………………………………………..…………22
§ 1.263A-9……………………………………………………………….....13, 21
§ 1.263A-9(a)(1)……………………………………………………………21
§ 1.263A-10…………………………………………………………………22, 24

5688938.1

§ 1.263A-10(a)………………………………………………...……………24, 26, 27
§ 1.263A-10(b)(1)…………………………………………….………………24, 26
§ 1.263A-10(b)(2)……………………………………………………………24, 26
§ 1.263A-11(a)……………………………………………...……22, 26, 34
§ 1.263A-11(d)……………………………………………………………36, 38
§ 1.263A-11(e)(1)…………………………………………...…………23
§ 1.263A-11(e)(1)(ii)(B)……………………………………………Passim
§ 1.263A-11(e)(2)……………………………………………………2, 11, 41
§ 1.263A-12………………………………………………………24, 28

5688938.1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS


No. 08-195 T

(Judge Lettow)

DOMINION RESOURCES, INC.,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

————

**CROSS-MOTION OF THE UNITED STATES FOR SUMMARY JUDGMENTAND
OPPOSITION OF THE UNITED STATES TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT**

————

Defendant, the United States, pursuant to Rule 56 of the Rules of the Court of Federal

Claims ("RCFC"), hereby cross-moves for summary judgment and opposes plaintiff's motion for

summary judgment on the grounds that there is no genuine issue as to any material fact and that

defendant is entitled to a judgment as a matter of law.  In support of its opposition and cross-

motion, defendant relies on the brief filed herewith, defendant's proposed findings of

uncontroverted facts, and the exhibits contained in the appendix filed herewith.

       Accordingly, defendant requests that defendant's cross-motion for summary judgment be

granted, plaintiff's motion for summary judgment be denied, and judgment entered in favor of

the United States on its counterclaim.


                                Respectfully submitted,


                              <u>s/Carl D. Wasserman</u>
                              CARL D. WASSERMAN
                              Attorney of Record
                              U.S. Department of Justice
                              Tax Division
                              Court of Federal Claims Section
                              P.O. Box 26
                              Ben Franklin Station
                              Washington D.C. 20044
                              202-307-6587


                              JOHN A. DiCICCO
                                Assistant Attorney General
                              STEVEN I. FRAHM
                                Chief, Court of Federal Claims Section
                              MARY M. ABATE
                                Assistant Chief, Court of Federal Claims Section


                              <u>s/Mary M. Abate</u>
                              Of Counsel

                              Attorneys for Defendant


Dated:  July 9, 2010

ix

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

_____

No. 08-195 T

(Judge Lettow)

DOMINION RESOURCES, INC,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

_____

**BRIEF OF THE UNITED STATES IN SUPPORT OF
ITS CROSS-MOTION FOR SUMMARY JUDGMENT
AND IN OPPOSITION TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT**

_____

Plaintiff, Dominion Resources, Inc. (DRI), sues for a refund of $297,699 in federal

income taxes, plus interest according to law, for its taxable year 1996.  DRI contends that

Treasury Regulation § 1.263A-11(e)(1)(ii)(B), promulgated under Code § 263A, improperly

required capitalization of interest costs related to DRI's temporarily withdrawing two power

generating units from service so that it could make capital improvements to those units.  The

United States has counterclaimed for tax and interest erroneously refunded to DRI for 1996,

resulting from a mistake in the calculation of the amount of the interest required to be capitalized

under Code § 263A for that year pursuant to the regulation.[1]

## QUESTIONS PRESENTED

1.      Treasury Regulations § 1.263A-11(e)(1)(ii)(B) requires that the amount of interest to be capitalized under Code § 263A be computed on the entire adjusted basis of a unit of property temporarily withdrawn from service to complete an improvement of that property, during the production period.  This includes the functionally interdependent components of that property that were withdrawn from service (the "associated property") as well as that of the improvement to the property.  Is the regulation arbitrary, capricious, or manifestly contrary to § 263A?

2.      Treasury Regulations § 1.263A-11(e)(2) provides an exception to the requirement to capitalize interest on associated property if, on the date the production period of the unit of property to be withdrawn from service begins, the taxpayer reasonably expects that cost of the improvement is *de minimis*, as defined in the regulation.  May a taxpayer retroactively seek application of the *de minimis* rule based on a settled value assigned to the cost of the improvement 11 years *after* the production began?

3.      If the United States prevails on Question One, is it entitled to judgment on its counterclaim for the amount of tax and statutory interest erroneously refunded to DRI as a result of the mistaken calculation of the amount of interest properly required to be capitalized under § 263A, pursuant to the regulation?

---

[1]  DRI filed a related action (Fed. Cl. No. 09-303 T), seeking a refund of a total of $1,345,736 in taxes, plus statutory interest, attributable to the same issue under § 263A for tax years 1995 and 1997.  The United States filed a counterclaim in that suit based on the same error in calculating the capitalized interest amounts, for 1995 and 1996.  The parties agree that the Court's disposition of the issues in this case will also dispose of the issues in the related case.

**INTRODUCTION**

Internal Revenue Code § 263A(a)(1), (2), enacted in the Tax Reform Act of 1986, denies a current deduction, and instead requires capitalization, of all direct costs and an allocable portion of the indirect costs of all "property" to which § 263A applies–*i.e.*, all "real or tangible personal property produced by the taxpayer." (Sec. 263A(b)(1).)  Section 263A(f) prescribes special rules for allocating interest to property produced by the taxpayer.  Section 263A(i) directs that "[t]he Secretary shall prescribe such regulations as may be necessary or appropriate to carry out the purposes of this section . . . ."

Treasury Regulations § 1.263A-11(e)(1)(ii)(B) addresses substantively the following question: should DRI treat all relevant interest costs associated with financing construction of a capital improvement as an *investment* in the asset – with those costs amortized over the life of the asset – or is DRI entitled to tax-deferral on the income to be generated by the improved asset by treating those costs as a *current* deduction?  The regulation requires DRI to add those costs – here interest costs associated with temporarily removing a unit of property from service in order to make capital improvements – to the basis of that asset and amortize those expenses over time. As explained below, by requiring capitalization of interest on associated property temporarily removed from service, the regulation at issue implements Congress's aim to: (1) match costs incurred for the purpose of producing future revenue with the assets that will produce that revenue; (2) to treat taxpayers uniformly in prescribing how costs are taken into account when capital assets are constructed; and (3) to objectively measure the relevant amounts to be capitalized.

In order to fully understand "the purposes of [§ 263A]" that Congress charged the

Treasury with implementing, and thus the relevance of § 1.263A-11(e)(1)(ii)(B) of the

Regulations, a short description of the development of the statutory rules for capitalization of

interest costs related to construction of property is in order.

> **A.** **The Tax Reform Act of 1976 - New Code § 189 Denies to Individuals**
> **Some Interest Deductions Formerly Allowed Under § 163**

Internal Revenue Code § 263 has always denied a deduction for capital expenditures.

With a few exceptions, under § 263(a)(1), no deduction is allowed for "[a]ny amount paid out for

new buildings or for permanent improvements or betterments made to increase the value of any

property or estate."  Prior to the Tax Reform Act of 1976, however, Code § 163(a) allowed a

current deduction for "all interest paid or accrued within the taxable year on indebtedness."  In

proposing to enact what became new § 189, the House Ways and Means Committee noted that

this dichotomy permitted mismatching of income and expenses related to construction of real

property:

> [I]t is argued that the allowance of a deduction for construction period interest and taxes
> is contrary to the fundamental accounting principle of matching income and expenses.
> Generally, a current expense is deductible in full in the taxable year paid or incurred
> because it is necessary to produce income and is usually consumed in the process.
> However, some expenditures are made prior to the receipt of income attributable to the
> expenditures and, it is argued that under the matching concept, these expenditures should
> be treated as a future expense when the income "resulting" from the expenditure is
> received and the original investment is gradually consumed.

H.R. Rep. No. 658, 94th Cong., 2d Sess. 31 (1976).  Thus, § 189 provided that "construction

period interest and taxes are to be capitalized in the year in which they are paid or incurred and

amortized over a 10-year period."  H.R. Conf. Rep. No. 1515. 94th Cong., 2d Sess. 408 (1976).

The immediate impetus for this legislation was Congress' recognition that "the allowance

of a deduction for construction period interest and taxes has contributed to the development of

4

tax shelters in the real estate industry," a development that resulted in the "equivalent [of] an interest-free loan from the Federal Government . . . ." *Id.* at 32.  Therefore, as originally enacted, § 189 applied only to "an individual" (defined as including Subchapter S corporations and personal holding companies) and to real property to be used in a trade or business or for investment.

### B.    TEFRA 1982 - Code § 189 Is Applied to Corporations as Well

In the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), however, Congress decided to extend the construction period interest-capitalization requirement to corporations:

> Corporations other than personal holding companies and subchapter S corporations are not now required to capitalize construction period interest and taxes. The ability to currently deduct construction period interest and taxes permits the deferral of tax on current income, which is the equivalent of an interest-free loan from the government that can be a significant economic benefit.  The committee believes that this situation is not compatible with the general objective of matching income and expenses. The committee, therefore, has decided that corporations should be required to capitalize construction period interest and taxes.

S. Rep. No. 494 (Part II), 97th Cong., 2d Sess. 128 (1982).  The Senate amendment, which was adopted by the Conference Committee, also required that the Treasury Department issue regulations governing interest allocation using rules "similar to those contained in Financial Accounting Standards Board Statement Number 34, as amended."  H.R. Conf. Rep. No. 760 (Part II), 97th Cong., 2d Sess. 484-85 (1982).  The Conference Committee observed:

> Under those rules, the amount of interest to be capitalized is the portion of the total interest expense incurred during the construction period that could have been avoided if funds had not been expended for construction.  Interest expense that could have been avoided includes interest costs incurred by reason of additional borrowings to finance construction and interest costs incurred by reason of borrowings that otherwise could have been repaid with funds expended for construction.

*Id.* at 485.  For reasons explained below, (see Argument, I.C.) the adoption of this "avoided cost"

method of determining capitalized interest would serve to obtain a better measure of the

taxpayer's total investment in the asset, as well as charge a cost that relates to acquisition of a

resource to benefit future periods against the revenues of the periods benefitted.

      **C.**    **The Tax Reform Act of 1986 - New Code § 263A Requires**
              **Capitalization of All Direct and Allocable Indirect Construction**
              **Period Costs**

        Treasury had not yet promulgated regulations under Code § 189 when Congress

overhauled the capitalization rules for production costs and long-term contracts, in the Tax

Reform Act of 1986.[2]  Section 189(e)(1)(A) defined "real property construction period interest"

to mean all "interest paid or accrued on indebtedness incurred or continued to acquire, construct,

or carry real property," plus relevant real property taxes.  Congress recognized, however, that the

general language of the provision permitted: (1) mismatching of current costs with future income

produced by the property; and (2) disparity in treatment among taxpayers as a result of a

taxpayer's subjective determinations about the nature and uses of property – *i.e.*, whether the

production of property should be considered a capital improvement.  *See*, H.R. Rep. No. 426,

99th Cong., 1st Sess. 625 (1986).  In characterizing the first of these deficiencies, the Senate

Finance Committee wrote:

> First, the existing rules may allow costs that are in reality costs of producing, acquiring,
> or carrying property to be deducted currently, rather than capitalized into the basis of the
> property and recovered when the property is sold or as it is used by the taxpayer.  This
> produces a mismatching of expenses and the related income and an unwarranted deferral
> of taxes.

S. Rep. No. 313, 99th Cong., 1st Sess. 140 (1986).  Regarding the nature and intended uses of

---

     [2]  *See* Internal Revenue Service Non Docketed Service Advice Review, 1988 IRS NSAR
8414, 1988 WL 1092583 (IRS NSAR) (January 22, 1988) (stating that the regulations project
under § 189 was terminated when the Tax Reform Act of 1986 repealed § 189).

capital assets, the Senate Committee commented, "These differences may create distortions in the allocation of economic resources and the manner in which certain economic activity is organized."[3]  *Ibid.*  Therefore, Congress concluded that (*ibid.*)–

> in order to more accurately reflect income and make the income tax system more neutral, a single, comprehensive set of rules should govern the capitalization of costs of producing, acquiring, and holding property, including interest expense, subject to appropriate exceptions where application of the rules might be unduly burdensome.

> The House Ways and Means Committee also observed that, under then-present law--

> [a]lthough substantially all direct production costs must be capitalized, the treatment of *indirect* costs may vary depending on the type of property produced.  For example, different rules may apply depending on whether the property is fungible property held in inventory, nonfungible property held for sale to customers, property produced under a long-term contract, farm products, or timber.

H.R. Rep. No. 426, at 615 (emphasis added).  The Committee also was concerned with the proper treatment of indirect costs associated with property that was self-constructed by the taxpayer:

> A taxpayer that constructs a building or other capital asset for its own use must capitalize all direct construction costs such as direct materials and labor.  Moreover, depreciation on the taxpayer's equipment used to construct the property may not be deducted currently but must be capitalized into the basis of the self-constructed property.

> The proper tax treatment of many indirect expenses incurred in connection with the self-construction of property, however, is uncertain.

*Id.* at 618 (footnotes omitted; citing *Idaho Power Co. v. Commissioner*, 418 U.S. 1 (1974), as requiring capitalization of construction-related depreciation.)  The Court in *Idaho Power* held that equipment depreciation allocable to the taxpayer's construction of capital facilities was an

---

[3]  This, of course, was shorthand for saying that the ability to game tax benefits, rather than marketplace principles of efficiency, could determine how or whether a taxpayer constructed property.

7

amount "paid out" for construction or improvement of capital assets, and thus must be capitalized under § 263(a)(1), because it was "a part of the taxpayer's cost or investment in the capital asset." 418 U.S. at 14. Viewed in this light, even though depreciation was not an "expenditure" in the literal sense, it was a cost, and denial of a current deduction served to prevent an unwarranted tax deferral and to promote tax parity by treating the self-constructor Idaho Power equally with those who would have to hire independent contractors and literally incur expenditures. *Ibid.*

In addition, the Conference Committee pointed out that the legislative history of the 1982 amendments to Code § 189 had required Treasury to "issue regulations allocating interest to expenditures for real property during construction consistent with the method prescribed by Financial Accounting Standards Board Statement Number 34 (FAS 34)" but that Treasury had not yet done so. *Id.* at 625. *See* S. Rep. No. 313 at 136, 139-40.

Accordingly, as the Senate Finance Committee explained:

> The bill requires application of a uniform set of capitalization rules to all costs incurred in manufacturing or constructing property or in purchasing and holding property for resale. In addition, interest costs generally will be subject to capitalization in cases where the interest is allocable to construction of real property . . . .
>
> * * *
>
> Uniform capitalization rules prescribed by the Treasury Department will govern the inclusion in inventory or capital accounts of all costs (1) incurred in manufacturing, construction, and other types of activities involving the production of real or personal property, or (2) incurred in acquiring or holding such property for resale. Thus, the rules will apply to assets to be held by a taxpayer in inventory or for sale to customers in the ordinary course of business, and to assets or improvements to assets constructed by a taxpayer for its own use in a trade or business . . . .

*Id.* at 141. With respect specifically to capitalization of interest:

> The committee intends that the determination of whether debt is incurred or continued to finance the production of property will be made under rules similar to those applicable under section 189 of present law. Under these rules, any interest expense that

8

would have been avoided if production or construction expenditures had been used to repay indebtedness of the taxpayer is treated as construction period interest subject to capitalization.  Accordingly, under the bill, debt that can be specifically traced to production or construction expenditures first must be allocated to production or construction.  If production or construction expenditures exceed the amount of this debt, interest on other debt of the taxpayer must be treated, to the extent of this excess, as production or construction period interest.  For this purpose, the assumed interest rate would be an average of the rates on the taxpayer's outstanding debt (excluding debt specifically traceable to production or construction).

*Id.* at 144 (footnotes omitted).[4]

Thus, in furtherance of the tandem goals of capturing all relevant costs and promoting neutrality among taxpayers, Congress adopted by statute two key concepts.  The first requires the capitalization of *costs* – as opposed to "expenditures."  The second requires use of the avoided cost method of determining the amount of construction period interest to be capitalized.  The Conference Committee explained, moreover:

The conferees wish to clarify that the avoided cost method of determining the amount of interest allocable to production is intended to apply irrespective of whether application of such method (or a similar method) is required, authorized, or considered appropriate under financial or regulatory accounting principles applicable to the taxpayer.  Thus, for example, a regulated utility company must apply the avoided cost method of determining capitalized interest even though a different method is authorized or required by Financial Accounting Standards Board Statement 34 or the regulatory authority having jurisdiction over the utility.  No inference is intended that the avoided cost method is not required in such circumstances under section 189 of present law.

---

[4]  In footnote 44 to the Finance Committee report (omitted from the passage at page 144 quoted above), the Committee noted that cumulative construction costs, including interest, related to prior periods, are required to be capitalized:

Production or construction expenditures include the cumulative production costs required to be capitalized, including interest required to be capitalized as a production or construction cost for prior periods.  In addition, interest on debt that relates to any asset that is devoted to the production of property generally must be capitalized as part of the cost of that property, whether or not the cost of the asset has been fully reflected in the property account.  Where such an asset is used for the production of property and for other purposes, only the allocable portion of such interest must be capitalized.

H.R. Conf. Rep. No. 841 (Part II), 99th Cong., 1st Sess. 309 (1986).

## FACTUAL BACKGROUND OF THIS CASE

DRI is a regulated utility company primarily engaged in the business of furnishing electrical power and natural gas to individual and commercial customers.  (Stip. ¶ 14; DPFUF ¶ 1).  During 1996, Virginia Electric & Power Company, a subsidiary of DRI, owned and operated the Possum Point Power Station, a coal-fired electric generating plant located in Dumfries, Virginia; and the Mount Storm Power Station, a coal-fired electric generating plant located in Mount Storm, West Virginia.  (Stip. ¶¶ 15, 42.)

Possum Point contains six independent generating units, two of which were retired in the early 1990s.  (Stip. ¶ 16.)  During the period March 9, 1996 through May 13, 1996, DRI replaced the existing coal burners in the eight lower corners of the boiler in Possum Point's Unit 4 generator.  (Stip. ¶ 18.)  It was necessary to remove the entire Possum Point Unit 4 generating plant from service during that time period in order to replace the burners.  (Stip. ¶¶ 19, 20.)  The items removed from service constituted "functionally interdependent" components of Possum Point Unit 4 pursuant to Treas.  Reg. § 1.263A-8.  (DPFUF ¶ 3.)

Mount Storm contains three independent generating units.  (Stip. ¶ 43.)  During the period September 6, 1996 through December 2, 1996, DRI replaced the existing coal burners in the eight lower corners of the boiler in Mount Storm Unit 3.  (Stip. ¶ 45.)  It was necessary to remove the entire Mount Storm Unit 3 generating plant from service during that time period in order to replace the burners.  (Stip. ¶¶ 46, 47.)  The items removed from service constituted "functionally interdependent" components of Mount Storm Unit 3 pursuant to Treas. Reg. § 1.263A-8.  (DPFUF ¶ 4.)

10

On the day each of the respective production periods for the replacement projects began –

within the meaning of §1.263A-11(e)(2) – DRI estimated the cost of replacing the Possum Point

Unit 4 burners at $10,214,342.00, and the Mount Storm Unit 3 burners at  $11,026,800.00.  (Stip.

¶¶ 25, 53.)

On October 27, 1997, DRI filed with the IRS its federal income tax return (Form 1120)

for tax year 1996 on which it reported $480,953,396.00 in income, and $137,706,282.00 of tax

liability.  (Stip. ¶¶ 1, 2.)  On August 21, 2000, the IRS issued DRI a Form 886A, Explanation of

Changes, in which it disallowed deductions claimed by DRI for interest relating to the burner

projects at both Possum Point Unit 4 and Mount Storm Unit 3, instead requiring that interest to

be capitalized.  (Stip ¶¶ 20, 47.)  Specifically, the IRS determined that DRI failed to capitalize

interest with respect to the total adjusted basis of each unit of property ("the associated

property") during the period the generating plants were removed from service so that the burners

could be installed, as required by Treas. Reg. § 1.263A-11(e)(1)(ii)(B).  (Stip ¶¶ 20, 47.)

On December 18, 2001, DRI submitted a request that the IRS National Office provide

technical advice regarding the requirement to capitalize interest on associated property.  (Stip. ¶¶

21, 46.)  On August 21, 2002, the National Office issued a Technical Advice Memorandum

(TAM) with respect to application of §1.263A-11(1)(e)(ii)(B).  (Stip. ¶¶ 22, 48.)  Subsequently,

the IRS issued a revised Form 886A, dated May 16, 2003, determining that for purposes of

interest capitalization, the adjusted basis of the relevant unit of property temporarily removed

from service in Possum Point Unit 4 (*i.e.*, the entire generating plant) was $9,883,982.00 (Stip.

¶¶ 20, 23); and for purposes of interest capitalization, the adjusted basis of the relevant unit of

property temporarily removed from service in Mount Storm Unit 3 (*i.e.*, the entire generating

11

plant) was $131,824,851.00.  (Stip. ¶¶ 47, 50.)  Based on this determination, in the revised Form

886A, the IRS computed the amount of capitalized interest on associated property for Possum

Point Unit 4 as $177,274.00 (Stip. ¶ 31, JE 9); and computed the amount of capitalized interest

on associated property for Mount Storm Unit 3 as $3,152,360.00.  (Stip. ¶ 60, JE 9).

      On November 26, 2003, DRI filed a protest with the IRS Appeals Office contesting the

capitalization of interest on the Possum Point Unit 4 and Mount Storm Unit 3 associated

property.  (Stip. ¶ 34.)  After several years of the appeals process, which covered a number of

additional issues, on August 3, 2007, DRI and the IRS entered into an "Offer to Waive

Restrictions on Assessment and Collection of Tax Deficiency and to Accept Overassessment"

(Form 870-AD) for 1991 through 1998, setting forth agreed figures for assessments of

deficiencies and overassessments.  (Stip. ¶ 6 (JE 1, JX 0001)).  The parties agreed to an

overassessment of taxes for the 1996 tax year in the amount of $9,564,557.00.  (JE 1, JX 0001).

The Form 870-AD specifically reserved to the taxpayer the right to file a claim for refund for

matters that included, "the amount of interest properly capitalized by the Internal Revenue

Service under section 263 of the Internal Revenue Code of 1986, with respect to 'associated

property,' as defined in Treasury Regulation § 1.263A-11(e), and any correlative adjustments for

the years 1995 through and including 1998."  (JE 1, JX 0001)  On October 1, 2007, DRI filed a

claim for refund in the form of an 1120X amended return, seeking $297,699, (Stip. ¶ 9, JE 2 JX

0004-0007), claiming that the TAM the IRS issued was incorrect when it "indicat[ed] that when

computing capitalized interest on self-constructed assets in accordance with Internal Revenue

Code ("IRC") Section 263A, property temporarily removed from service during construction

must be taken into account."  (JE 2, JX 0007).  The claim for refund continued that this was

12

erroneous "since it does not take into account 'avoided costs' principles as required by Treas. Reg. 1.263A-9 and IRC Section 263A9(f)(2). (JE 2, JX 0007).

After plaintiff filed this suit regarding the amount of interest properly capitalized on associated property, the IRS determined that the proper amount of interest on associated property was actually twice the amount it had *actually* required plaintiff to capitalize for both Possum Point Unit 4 (Stip. ¶¶ 31, 37) and Mount Storm Unit 3 (Stip. ¶¶ 60, 64). Because the IRS had erroneously refunded half the capitalizable interest on associated property, defendant filed a timely counterclaim on October 23, 2009 to recover the proper amount.

## ARGUMENT

### I

### TREASURY REGULATIONS § 1.263A-11(e)(1)(ii)(B) IS VALID

#### A.    The Standard to Be Applied by the Court in this Case

As already noted, and to be discussed below, in § 263A(i), Congress not only authorized, but explicitly *required*, the Secretary of the Treasury to "prescribe such regulations as may be necessary or appropriate to carry out the purposes of [§ 263A] . . . ." In the legislative history of not only § 263A but its predecessor § 189, Congress explicitly stated its intention that Treasury promulgate regulations that incorporated principles "similar to" those set out by the Financial Accounting Standards Board in FAS 34. Moreover, Congress mandated, with specificity, that Treasury "issue regulations *allocating interest* to expenditures for real property during construction consistent with the method prescribed by Financial Accounting Standards Board

13

Statement Number 34 (FAS 34)."  *See* S. Rep. No. 313 at 625 (emphasis added).[5]  Treasury

Regulations § 1.263A-11(e)(1)(ii)(B) was promulgated pursuant to that mandate, to implement

Code § 263A(f)– "Special Rules for *Allocation of Interest* to Property Produced by the

Taxpayer."  (Emphasis added.)

In *United States v. Morton*, 467 U.S. 822 (1984), the Supreme Court addressed an

analogous situation.  There–

> as part of the 1977 amendment, Congress authorized the promulgation of "regulations for
> the implementation of the provisions of [42 U.S.C.] section 659," . . . .  Because
> Congress explicitly delegated authority to construe the statute by regulation, in this case
> we must give the regulations legislative and hence controlling weight unless they are
> arbitrary, capricious, or plainly contrary to the statute.

*Id.* at 834.  The Court went on to hold that, because the implementing regulations carried out

"the precise objective of Congress when it delegated authority to issue regulations," the

regulations at issue were "entitled to special deference."  *Ibid.*

Plaintiff contends (at 14-16) that the two-step test for judicial review of an agency's

interpretation of a statute it administers, set forth in *Chevron U.S.A., Inc.* v. *Natural Resources*

---

[5]  The Supreme Court (per Justice Stevens) recently expressed its view of the usefulness
of legislative history:

> As for the propriety of using legislative history at all, common sense suggests that
> inquiry benefits from reviewing additional information rather than ignoring it. . . .
> Legislative history materials are not generally so misleading that jurists should never
> employ them in a good-faith effort to discern legislative intent.  Our precedents
> demonstrate that the Court's practice of utilizing legislative history reaches well into its
> past.  We suspect that the practice will likewise reach well into the future."

*Samantar v. Yousuf*, 130 S. Ct. 2278, 2288 n.9 (quoting *Wisc. Pub. Intervenor v. Mortier*, 501
U.S. 597, 611-12 (1991) (internal citations omitted).)

*Defense Council*, 467 U.S. 837 (1984),[6] is the standard to be applied in this case, and that the

Treasury Regulation at issue "fails at step one."  But *Chevron* did not involve an agency

regulation–it involved an agency order; and there was no explicit delegation by Congress to the

agency to issue regulations.  That is why, in *Chevron*, the Court observed (at 844):

> Sometimes the legislative delegation to an agency on a particular question is implicit
> rather than explicit.  In such a case, a court may not substitute its own construction of a
> statutory provision for a reasonable interpretation made by the administrator of an
> agency.

The Court then went on to hold that "the EPA's definition of the term 'source' is a permissible

construction of the statute."  *Id.* at 866.  Earlier in the opinion, however, the Court had stated (at

843-44):

> If Congress has explicitly left a gap for the agency to fill, there is an express delegation
> of authority to the agency to elucidate a specific provision of the statue by regulation.
> Such legislative regulations are given controlling weight unless they are arbitrary,
> capricious, or manifestly contrary to the statute.

For this proposition, the Court cited its opinion in *Morton*.  *Chevron* and *Morton* were both

written by Justice Stevens, just one week apart.

The regulation at issue in this case was promulgated pursuant to an express mandate of

Congress, and it carried out "the precise objective of Congress when it delegated authority to

issue regulations," to govern the allocation of interest.  The regulation is thus entitled to "special

_____

[6]  First, always, is the question whether Congress has directly spoken to the precise
question at issue.  If the intent of Congress is clear, that is the end of the matter
. . . .  [I]f the statute is silent or ambiguous with respect to the specific issue, the
question for the court is whether the agency's answer is based on a permissible
construction of the statute.

*Chevron U.S.A., Inc.* v. *Natural Resources Defense Council*, 467 U.S. 837, 842-43 (1984).  *See
also*, *Northern Colorado Water Conservancy Dist.* v. *United States*, 88 Fed. Cl. 636, 659 (2009)
(setting forth the *Chevron* analysis).

deference," unless it is arbitrary, capricious, or plainly contrary to the statute.[7]  It is not.

### B.    The Statutory Scheme

Section 263A generally requires various property *costs* to be capitalized:[8]

> SEC.   263A. Capitalization and Inclusion in Inventory Costs of Certain Expenses
> (a) Nondeductibility of Certain Direct and Indirect Costs
> (1) In General. – In the case of any property to which this section applies, any costs described in paragraph (2)
>> (A) in the case of property which is inventory in the hands of the taxpayer, shall be included in inventory costs, and
>> (B) in the case of any other property, shall be capitalized.
> (2) Allocable Costs. – The costs described in this paragraph with respect to any property are–
>> (A) the direct costs of such property, and
>> (B) such property's proper share of those indirect costs (including taxes) part or all of which are allocable to such property.

Section 263A(b) requires that "real or tangible personal property produced by the taxpayer" be subject to the capitalization rules of this provision.  And § 263A(g) defines the term  "produce," for purposes of that section, as including "construct, build, install, manufacture, develop, or improve."

Section 263A(f) provides "Special Rules for Allocation of Interest to Property Produced by the Taxpayer" (emphasis added):

>> (1) Interest Capitalized Only in Certain Cases. – Subsection (a) shall only apply to interest costs which are–
>>> (A) paid or incurred during the production period, and
>>> (B) allocable to property which is described in subsection (b)(1) and which has–
>>>> (i) a long useful life,

---

[7]  Even under the *Chevron* two-step analysis, as demonstrated below, the regulation is a reasonable and permissible implementation of the statute.

[8] This concept of financial "cost" as equivalent to actual "amounts paid out" is consistent with *Idaho Power*.

> (ii) an estimated production period exceeding 2 years, or
> (iii) an estimated production period exceeding 1 year and a cost exceeding $1,000,000.
>
> (2) *Allocation Rules-*
>> (A) In General – In determining the amount of interest required to be capitalized under subsection (a) with respect to any property –
>>> (i) interest on any indebtedness directly attributable to production expenditures with respect to such property shall be assigned to such property, and
>>> (ii) *interest on any other indebtedness shall be assigned to such property to the extent that the taxpayer's interest costs could have been reduced if production expenditures (not attributable to indebtedness described in clause (i)) had not been incurred.*

And, blending the concepts of "expenditure as cost" and the avoided cost method of calculating capitalized interest, § 263A(f)(4)(C) defines "production expenditures" as "the costs (*whether or not incurred during the production period*) required to be capitalized under subsection (a) with respect to the property."  (Emphasis added.)[9]

In sum, Congress plainly intended that *all* direct and indirect costs associated with the production of property in these circumstances, including interest, be capitalized.  Moreover, taxpayers that produce property without having to resort to direct borrowing are also required to capitalize interest in accordance with the avoided cost method, ensuring not only the capturing of the true costs associated with investment in the produced property, but also the achieving of tax parity with other taxpayers who must directly finance.  The statute does not flesh out all possible ways of applying the avoided cost method.  That was left to Treasury, using rules similar to (but

---

[9]  The "production period" is defined in § 263A(f)(4)(B) as follows:

> (B) Production period.--The term "production period" means, when used with respect to any property, the period–
>> (i) beginning on the date on which production of the property begins, and
>> (ii) ending on the date on which the property is ready to be placed in service or is ready to be held for sale.

17

not necessarily exactly duplicative of) the rules in FAS 34.[10]  *See*, Sec. 263A(i) ("The Secretary shall prescribe such regulations as may be necessary or appropriate to carry out the purposes of this section....").

  **C. FASB Statement No. 34: A Comprehensive Approach to Capitalization of Construction-Related Interest, and the Avoided Cost Concept**

  As discussed above, Congress explicitly indicated that regulations similar to FAS 34 are to govern the implementation of § 263A.  The Financial Accounting Standards Board (FASB) is a body officially recognized as authoritative by the American Institute of Certified Public Accountants (Rule 203, Rules of Professional Conduct, as amended May 1973 and May 1979).  For financial accounting purposes, its statements are considered the "highest authorities in the system of accounting norms."  *Gen. Elec. Co.* v. *United States*, 251 F.3d 976, 979 (Fed. Cir. 2001).  FASB issued its Statement No. 34 in 1979 ("FAS 34" or alternatively "SFAS 34") to establish standards of financial accounting and reporting for capitalizing interest cost as a part of the historical cost of acquiring certain assets.[11]  (FAS 34 ¶ 1; Def.' Exh. 3).

  FAS 34 laid out the purpose of capitalizing interest costs as follows:

  The objectives of capitalizing interest are (a) to obtain a measure of acquisition cost that more closely reflects the enterprise's total investment in the asset and (b) to charge a cost

---

 [10]  In adopting the final regulations, Treasury stated that "although the proposed regulations use an approach similar to SFAS 34," the use of FAS 34 cannot be permitted by individual taxpayers because "the bases of assets for book and tax purposes differ; SFAS 34 allows more discretion and subjectivity (*e.g.*, in identifying borrowings used to determine interest capitalization) than does the statute; and materiality standards used under financial accounting rules may not be acceptable for tax purposes."  1995-1 C.B. 20; T.D. 8584; 1995 IRB LEXIS 1822 at *14-15.

 [11]  The historical cost of acquiring an asset includes the costs necessarily incurred to bring it to the condition and location necessary for its intended use.  (FAS 34 ¶ 6; Def.'s Exh. 3.)

that relates to the acquisition of a resource that will benefit future periods against the revenues of the periods benefitted.

(FAS 34 ¶ 7; Def.'s Exh. 3.)  FASB thus rejected, as did the Supreme Court in *Idaho Power*, the notion that capitalization of construction costs was limited to "amounts paid out" (§ 263(a)(1)), instead adopting an economically realistic concept of "costs incurred" that reflects construction-related *interest* as an *investment* in an asset, as well as continuing to uphold the concept of matching the timing of interest costs incurred to the future revenues the asset would help to generate.

To fully account for interest as a cost of construction, FASB stated that the amount of interest cost to be capitalized is "the portion of the interest cost incurred during the assets' acquisition periods that theoretically could have been avoided (for example, by avoiding additional borrowings or by using the funds expended for the assets to repay existing borrowings) if expenditures for the assets had not been made."  (FAS 34 ¶ 12; Def.'s Exh. 3.) This is referred to as "avoided cost" accounting.  Expressed another way:

> Financing has a cost.  The cost may take the form of explicit interest on borrowed funds, or it may take the form of a return foregone on an alternative use of funds, but regardless of the form it takes, a financing cost is necessarily incurred.  On the premise that the historical cost of acquiring an asset should include all costs necessarily incurred to bring it to the condition and location necessary for its intended use, the Board concluded that, in principle, the cost incurred in financing expenditures for an asset during a required construction or development period is itself a part of the asset's historical acquisition cost.

(FAS 34 ¶ 40; Def.'s Exh. 3.)

And specifically relevant for the associated property cost interest capitalization regulation at issue in this litigation:

> [Various] Board members believe acquisition cost provides the most reliable measure of cash flow potential when assets are self-constructed or produced as well as when they are

19

> purchased in arms-length transactions.  Measuring the acquisition cost of a self-constructed asset is not as simple as measuring the acquisition cost of a purchased asset, but, those Board members believe, the objective should be the same – to obtain a measure of cash flow service potential that is supported by the objective evidence.... The cost of financing the asset during the period of its construction or production is one of those cost components.

(FAS 34 ¶ 42; Def.'s Exh. 3.)  The Treasury regulation treating capitalization of interest on associated property costs at issue in this litigation was designed to capture these costs.

As discussed above, shortly after the adoption of FAS 34, Congress took note of FASB's approach to capturing relevant construction-related interest costs and sought to incorporate similar methodology into law.  As the legislative history both of the 1982 amendment to § 189 and of § 263A indicates, Congress intended that rules promulgated by Treasury similar to FAS 34's avoided cost principles "govern" the capitalization of construction-related costs, including interest

### D.    Treasury's Regulatory Scheme

On August 16, 1991, the Treasury Department issued a notice of public hearing on proposed regulations dealing with § 263A(f), the capitalization of interest provision.  *See*, 56 FR 40842-01, 1991 WL 1565988 (F.R.).  After extensive notice and comment, Treasury issued regulations effective January 1, 1995.  The regulation on capitalization of interest on associated property at issue in this case is itself part of a scheme that depends on three other, related regulations, all focused on a common goal of implementing the statutory requirements of § 263A: the avoided cost regulation, the accumulated production expenditure regulation, and the unit of property regulation.  Taken together, they fully implement the Congressional intent to properly account for interest costs to be capitalized for future amortization rather than current deduction, to apply the rules evenhandedly among taxpayers, and to provide an objective

measure of cost analysis.  Although discussed more extensively below, these provisions bear

noting here.

      1.        **Avoided cost method - Treas. Reg. § 1.263A-9**

Treasury Regulations § 1.263A-9(a)(1) describes the avoided cost method outlined in

§ 263A(f).  The regulation states that "any interest that the taxpayer theoretically would have

avoided if the accumulated production expenditures (as defined in § 1.263A-11) had been used

to repay or reduce the taxpayer's outstanding debt must be capitalized under the avoided cost

method."  This assumption:

> [d]oes not depend on whether the taxpayer actually would have used the amounts
> expended for production to repay or reduce debt.  Instead, the avoided cost method is
> based on the assumption that debt would have been repaid or reduced without regard to
> the taxpayer's subjective intentions, or to restrictions, including legal, regulatory,
> contractual, or other restrictions against repayment or use of the debt proceeds.

§ 1.263A-9(a).[12]  Congress explicitly had in mind public utilities for application of § 263A and

its regulations, particularly because they self-construct assets or finance without direct

borrowing.

This statement of the avoided cost method implements Congress's desire that the full

measure of relevant interest cost be used, and more than that, seeks to treat taxpayers uniformly

and objectively by assuming, regardless of a taxpayer's intention or even legal ability, that debt

---

[12]  The fact that the regulation requires the capitalization of interest under the avoided
cost method even where debt could not have *legally* been retired by the taxpayer, is another
indication of Treasury's implementation of Congress's will that taxpayers be treated
evenhandedly and objectively.  Otherwise, any given taxpayer could claim that, for reasons
specific to it, various avoided costs should not be included.  Moreover, when a taxpayer
determines to produce property knowing that there may be various legal or other restrictions on
its debt, the taxpayer has decided it is still more profitable to produce the property.  Requiring
capitalization of the avoided interest in that circumstance serves Congress's other goal of
capturing the true costs of the production of property.

would be reduced if the production of property did not occur.  Consistent with FAS 34, it assumes that the taxpayer took all potential cost factors into account, and chose to produce property for future returns, rather than earn income today and pay down debt and debt cost.

## 2.    Accumulated production expenditures – Treas. Reg. § 1.263A-11(a)

Because "accumulated production expenditures" form the basis for computing all capitalized costs associated with producing a unit of property, Treasury adopted a definition of "accumulated production expenditures" that "generally means the cumulative amount of direct and indirect costs described in section 263A(a) that are required to be capitalized with respect to the unit of property (as defined in §1.263A-10)."  Sec. 1.263A-11(a).   Consistent with the Code's definition of production of property in § 263A(g) as including "improvement" of property,[13]  Treasury determined that an important measure of the cost of producing a unit of property is the decision to remove it from service in order to make the improvement.  In other words, when a taxpayer removes a unit of property from service (say, a power generating plant), in order to improve it, that unit of property is no longer generating revenue to pay down the taxpayer's debt.  The taxpayer willingly incurs or continues debt expense as part of the financial investment in improving the property.[14]  As discussed above, Congress was determined to capture these costs by requiring the avoided cost method of capitalizing interest.  The taxpayer must therefore account for the decision to incur or carry those interest costs by capitalizing them,

---

[13]  *See*, *also*, § 1.263A-8(d)(3)(i), stating that "any improvement to property constitutes the production of designated property."

[14]    Notably, Congress limited the capitalization requirement to taxpayers who are producing property for profit, § 263A(c)(1), recognizing that these decisions must be viewed in the context of a taxpayer choosing to make a current investment in order to receive a future profit.

and have them amortized over the life of the asset – the unit of property generating the revenue – rather than take a *current* deduction for the interest expense.  Thus, Regulations § 1.263A-11(e)(1) provides:

> (e) Improvements.–(1) General rule.  If an improvement constitutes the production of designated property under § 1.263A-8(d)(3), accumulated production expenditures with respect to the improvement consist of--
>
> (i) All direct and indirect costs required to be capitalized with respect to the improvement,
>
> (ii) In the case of an improvement to a unit of real property–
>
> (A) An allocable portion of land, and
>
> (B)  For any measurement period, the adjusted basis of any existing structure, common feature, or other property that is not placed in service or must be temporarily withdrawn from service to complete the improvement (associated property) during any part of the measurement period if the associated property directly benefits the property being improved, the associated property directly benefits from the improvement, or the improvement was incurred by reason of the associated property.

For reasons explained more fully below, Treasury reasonably determined that the most appropriate *measure* of the avoided interest cost that must be capitalized was to use the adjusted basis of the unit of property being improved, during the production period, at a given interest rate.  This puts a price tag on the taxpayer's decision to remove the unit of property from service, and determines that that cost should be capitalized, not currently deducted.  This is consistent with FAS 34 ¶ 51:

> Clearly, interest cost can be avoided by repaying existing borrowings as well as by not borrowing additional funds.  When an enterprise is contemplating investment in an asset, both those alternatives are available.  When the decision to invest in the asset is made, those alternatives are rejected and the incurrence of interest cost during the acquisition period is a consequence of that decision.  That cause-and-effect relationship between the investment in the asset and the incurrence of interest cost makes interest cost analogous to a direct cost in those circumstances.  Also, the amount of interest cost that could have been avoided is one measure of the opportunity cost incurred.  Admittedly, investment of

23

> funds in the asset also entails rejection of a wide range of other possible uses of funds, and therefore interest cost avoided is only one of several possible measures of opportunity cost. But it is the measure that can be recognized in the present accounting framework.

(Def.'s Exh. 3.)  Thus, when a taxpayer incurs "accumulated production expenditures" as defined in § 1.263A-11, the taxpayer confronts a choice: incur the costs of production, or avoid those costs of production and pay down debt.  If a taxpayer makes the choice to produce property, that taxpayer must be viewed as investing those costs into the revenue producing unit of property.

### 3.   Unit of property – Treas. Reg. § 1.263A-10

A "unit of property," as defined in the interest capitalization regulations, "is used as the basis to determine accumulated production expenditures under § 1.263A-11 and the beginning and end of the production period under § 1.263A-12."  Sec. 1.263A-10(a).  In turn, a "unit of real property" is defined as including "any components of real property owned by the taxpayer or a related person that are functionally interdependent," *see*, § 1.263A-10(b)(1), meaning "the placing in service of one component is dependent on the placing in service of the other component by the taxpayer or a related person."  § 1.263A-10(b)(2).  This provision establishes that a unit of property cannot be broken down into bits and pieces for purposes of determining capitalized interest.  If the taxpayer cannot use the entire unit of property because it is improving it, the entire unit of property attracts capitalized interest.  This fits hand-in-glove with the concept that when a taxpayer forgoes current income by idling a unit of property for the purpose of improving it – and thereby increasing the potential for earning future revenue – the costs associated with idling the property must be capitalized.  Capitalized interest on associated property temporarily withdrawn from service to facilitate an improvement must therefore take into account the entire unit of property.

### E.   Plaintiff's Position Regarding the Associated Property Regulation Requires Revision of the Language of the Statute

The fallacies on which DRI bases its challenge to Regulations § 1.263A-11(e)(1)(ii)(B) are encapsulated in the following passage from its brief (at 1-2) (emphasis added):

> [The] expenditure of funds reflected in the adjusted basis of the existing property covered by the associated property rule clearly was not an *expenditure* that resulted from the taxpayer's decision to *produce the improvement*.  Instead, these funds were expended *prior to the time when the taxpayer had any intention of undertaking the production* of the improvement.  If the taxpayer had not made the decision to produce the improvement, *these funds would have remained invested in the existing property*.  Thus, these funds would not have become available to pay down the taxpayer's debt if the taxpayer had not undertaken the production of the improvement.  Consequently, these funds are not properly included in the avoided cost determination for the production of the improvement.

As described at length above, Congress defined specific concepts in crafting § 263A to further the goals of matching current construction costs with the assets that generate future revenues, promoting tax parity among taxpayers, and achieving objectivity in measuring interest cost.  The associated property regulation implements those goals.  DRI is attempting to redefine, or ignores, the statutorily-defined concepts "property," "improvement," and "production expenditures"– terms that are integral to the function and purpose of the statute and on which the regulation is based.

### 1.   The "property produced," *not* the "improvement," is the "unit of property," and interest on its entire adjusted basis during the production period must be capitalized

As stated above, a purpose of § 263A was to more accurately capture interest as a part of the "costs of production, acquiring, or carrying property."  The United States and DRI agree that the avoided cost method is mandated by Congress, and further agree that both direct and indirect interest must be capitalized on the cost of the improvements to Possum Point Unit 4 and Mount

Storm Unit 3.  (*See*, *e.g.*, DRI Br. at 4 - 5.)  The crux of the dispute between the parties lies in

DRI's attempt to (mis)characterize the "property" produced as *limited* to the new coal burners

themselves (the "improvement"), rather than the *entire unit* of functionally interdependent

property – the power generating plants.  DRI's definition runs afoul of § 263A, as it fails to

account for the costs the statute was designed to reach.

        **a.**     **Interest is capitalized on the production of "property," not DRI's self-styled production of an "improvement"**

        **(i)**     **The adjusted basis of the entire unit of property must be taken into account, to properly capture avoided costs**

The interest capitalization rules apply to "real or tangible property produced by the

taxpayer."  Sec. 263A(b)(1).  Property is "produced" by the taxpayer if it "construct[s], build[s],

install[s], manufacture[s], develop[s], or improve[s]" property.  Sec. 263A(g).  By improving

Possum Point Unit 4 and Mount Storm Unit 3, DRI has therefore "produced property" (*i.e.*, the

improved generating plants).  DRI repeatedly argues that the rules apply to something it calls

"production of the improvement," which DRI means to limit solely to installation of the new

burners.  (*See*, *e.g.*, DRI Br. at 7-10, 15, 27-29.)  There is no such concept in the statute or the

regulations.

Treasury Regulations §1.263A-10(a) defines a "unit of property" as the "basis" upon

which accumulated production expenditures is determined, and by extension, the basis for

determining capitalized interest.  *See*, Treas. Reg. §1.263A-11(a).  In relevant part, a unit of real

property "includes any components of real property ... that are functionally interdependent."

Sec. 1.263A-10(b)(1).  That, in turn, is determined by whether the placing in service of one

component is dependent on the placing in service of the other component.  Sec. 1.263A-10(b)(2).

For purposes of determining the amount of avoided *interest* cost, the entire unit of functionally interdependent property must be taken into account, not merely the "new" parts, because that entire unit is not in service, and thus not generating revenue to pay down debt.

Here, the entire Possum Point Unit 4 and Mount Storm Unit 3 generating units had to be removed from service in order to replace the burners.  (Stip. ¶¶ 19, 20, 46, 47.)  The IRS determined that those entire facilities constituted a "unit of property" within the meaning of Treas. Reg. § 1.263A-10(b).  (Stip. ¶¶ 20. 47.)  (*See also* DRI Br. at 24.)  DRI *does not take issue with this determination,* nor can it.  In fact, DRI *agrees* that § 1.263A-10(a) defines the "unit of property" as the basis for determining what *costs* are considered accumulated production expenditures.[15]  This is crucial because it demonstrates that the "property produced" upon which interest is to be capitalized must include not merely the "improvement," as DRI would define it (here the replaced burners), but the entire adjusted basis of the property removed from service that "directly benefits the improvement," exactly as stated in the challenged regulation.

DRI argues (DRI Br. at 9, 10) that this treatment is contrary to the avoided cost method mandated by the statute, because (according to DRI) "[t]he adjusted basis of existing property covered by the associated property rule is not a cost that is capitalized under section 263A(a) as a result of the production of the improvement," and that that adjusted basis "represents costs capitalized on an entirely separate and independent prior occasion having nothing to do with the activity of production of the improvement that gives rise to the interest cost capitalization

_____

[15]  DRI is correct when it states, "in fact, treating functionally interdependent real property components as a single unit of property does not cause the amounts of cost in the interest cost capitalization base to be different than if the components were treated as separate units of property."  (DRI Br. at 27.) That is how the IRS calculated the adjusted basis of associated property – by adding the adjusted bases of its individual, functionally interdependent parts, and using that figure to compute the amount of capitalized interest.

requirement."  As an initial matter, DRI's premise is false on its face: the entire unit of property

has *everything* to do with the "production of the improvement," because, as even DRI

acknowledges, it could not have made the improvement without temporarily withdrawing all of

those (functionally interdependent) items from service.  (Stip. ¶¶ 19, 20, 46, 47.)  That cost must

be included in the capitalization of interest determination.  Moreover, DRI's position is

inconsistent with § 263A(f)(4)(C), which includes in the definition of "production expenditures"

all costs "whether or not incurred during the production period."

     Section 263A requires DRI to account for all direct and indirect interest costs associated

with financing the production of property.  Contrary to DRI's contention, the regulation at issue

does *not* require DRI to re-capitalize the "adjusted basis of existing property" as if the IRS were

forcing it to pay for the entire value of Possum Point Unit 4 and Mount Storm Unit 3 all over

again.  Rather, DRI *is* required to capitalize *interest,* the allocable amount of which is computed

on the adjusted bases of Possum Point Unit 4 and Mount Storm Unit 3 during the months those

generating plants were withdrawn from service to permit the improvements.[16]  The associated

property cost regulation looks at the entire adjusted basis of the unit of property produced, the

*time* it takes to produce it, and the relevant interest rate to determine the appropriate amount of

interest to be capitalized.[17]  Because the entire Possum Point Unit 4 and Mount Storm Unit 3

---

[16]  In the Revised 886-A (JE 9) the IRS illustrated how the regulation determined
capitalized interest.  By taking the adjusted basis of the functionally interdependent items of
Possum Point Unit 4, ($9,883,982), at an agreed on interest rate of 7.17419%, for three months,
the IRS calculated $177,274 in associated property interest costs.  (JX000121).  *See also,* Stip. ¶¶
31, 32, 33.  Moreover, because the IRS treats this interest as a capital cost, it allowed DRI to
deduct $3,324.00 of this capitalized interest as depreciation.  DRI continues to depreciate the
interest it was required to capitalized to this day.  (Stip. ¶ 38.)  The same holds true for Mount
Storm Unit 3.

[17]  This is the "production period."  *See,* § 263A(f)(4)(B) and §1.263A-12.

generating units were required to be taken out of service so that significant capital improvements could be made, the post-improvement Possum Point Unit 4 and Mount Storm Unit 3 generating facilities in their entirety, not just the burners, are the "property produced" for purposes of capitalizing interest.  This makes perfect sense under avoided cost methodology because it comprehensively reflects DRI's decision to invest in those assets. (*See*, *e.g.*, FASB 34 ¶ 42, 51.)

DRI was not without options when it chose to improve the generating plants:

1) DRI chose not to sell those units.  A sale would have generated revenue that, under the avoided cost method, would be assumed to be used to pay down DRI's debt and interest costs.  Debt and interest would therefore have been avoided on the *entire* adjusted basis of each unit of property – not just the "improvement."[18]

2)  DRI chose not to abandon Possum Point Unit 4 and Mount Storm Unit 3, and construct brand new generating plants "from scratch."  DRI agrees that this process would have incurred capitalized interest on the *entire basis of the generating facilities*, not simply on the burners.[19]

3) Instead, DRI chose *to incur* the costs of shutting down those "units of property" so that it could produce *improved* units of property – thereby investing the costs associated with financing the "old" units of property into the production of "improved" units of property.  DRI could not have replaced the burners without removing the entire Possum Point Unit 4 and Mount

---

[18]  DRI purchased a power plant in 1998 called Kincaid from an owner that decided to sell off its property and pay down its debt.  *See*, Pl.'s Response to Def.'s First Set of Interrogatories.  (Def.'s Exh. 2).  DRI could have made the same decision, here.

[19]  *See*, *e.g.*, DRI Br. at 22 - 23 indicating its agreement that a taxpayer producing property to be put into service for the first time would attract capitalized interest on the entire adjusted basis.

Storm Unit 3 units of property from service.  Therefore, while they were idle, those units of property were not paying down the debt, and the interest avoided from that decision must be considered an investment in the improved plants.  Alternatively viewed, DRI was financing the entire Possum Point Unit 4 and Mount Storm Unit 3 to sit idle, and those financing costs during the time the units of property were taken out of service are avoided interest costs.[20]

**(ii)    Use of the entire adjusted basis promotes tax parity**

Moreover, viewing the property taken out of service in its *entirety* as the "property produced" also supports the fundamental principle of tax parity, described in detail above. Congress desired that a taxpayer self-constructing an asset accounted for the same capitalized interest cost as another taxpayer who constructed an identical unit of property using contractors or through direct borrowing.  According to DRI's "production of the improvement" view, on the day DRI places its asset back in service, it would have a generating unit with a high adjusted basis and new burners, but with interest capitalized *only* on the new burners during the time the unit of property was removed from service, whereas another taxpayer seeking to place an identical unit of property in service for the first time on that day would have capitalized interest costs on the *entire* unit of property for the entire span of time it took to construct it.

Further, by capitalizing interest on the entire unit of property temporarily withdrawn

---

[20]  *See* FAS 34 ¶ 42: "The cost of financing the asset during the period of its construction or production is one of those cost components" of a self-constructed asset like Possum Point 4 and Mount Storm Unit 3.  (Def.'s Exh. 3.)

DRI argues (at 29) that the existing property was placed in service at the time it was originally acquired and not "placed in service a second time when the production of the improvement is completed."  While that statement might be technically correct for purposes of computing depreciation, for purposes of determining the § 263A "production period" for an improved unit of property, the "placed in service" concept simply serves as a cut-off point for measuring the production period covering the costs to be capitalized.

30

from service, the regulation removes the subjectivity of a taxpayer picking and choosing what

bits and pieces of property *it* would consider as contributing to the long-term value of its

improvement, and provides an objectively recognizable figure – the total adjusted basis of the

functionally interdependent components.

> (iii)   **DRI's depreciation example demonstrates further**
>         **fallacies in DRI's approach to the avoided cost concept**

DRI's misconception of the purpose of § 263A as it relates to defining a unit of property

is also evident from DRI's discussion of depreciation of improvements to property.  DRI states

(at 30) that for depreciation purposes, an improvement is depreciated separately from the

existing property to which the improvement relates.  DRI then argues that if the United States

were consistent in viewing the improvement and the underlying improved property as one unit:

> [t]his would require that the cost of the improvement simply be added to the remaining
> adjusted basis of the existing property and that the combined total be depreciated together
> over the remaining depreciation period for the existing property using precisely the same
> pattern of depreciation deductions that would have applied to the existing property in the
> absence of the improvement.

*Id.*  This "consistency" argument is a red herring.  The United States does not take the position

that Possum Point Unit 4 or Mount Storm Unit 3 should be considered a new facility for

*depreciation* purposes.  Depreciation is a method of accounting for the diminution in value of an

asset over time.  Treasury clearly recognized that with respect to capitalization of interest related

to producing property, "the concept of a single property may differ from the concept of a single

or separate property that taxpayers use for other purposes (*e.g.*, for computing amounts of

depreciation deductions or separately tracking the bases of assets.)"  1995-1 C.B. 20; T.D. 8584;

1995 IRB LEXIS 1822 *23.  But because capitalized interest is a method of determining how to

account for the costs of *financing* the asset while it lies idle during its improvement, the interest

costs DRI incurs while the entire unit lies idle are a cost of the improved facility and must be accounted for.

>   **b.     Even under DRI's misconception of the "property produced" as separate from the "improvement," the legislative history supports capitalizing interest on the associated property**

As previously discussed, § 263A expanded capitalization of interest requirements from those previously required under § 189, to rectify the problem of allowing the "costs of production, acquiring, or carrying property" to be deducted currently, rather than capitalized into the basis of the property and recovered when the property was sold, or as it was used by the taxpayer. Even under DRI's view that it did not "produce" an improved integrated "unit of property," but only the separate "improvement," it is at the very least "carrying" the remainder of the property, and financing it while it lies dormant. One of the production expenditures – defined as "costs" (see § 263A(f)) – therefore, is the cost of *carrying* Possum Point and Mount Storm while they rest and undergo improvement, instead of producing income and paying down DRI's significant debt.[21]  *Under no view can the decision to temporarily remove the associated property from service be costless*, and § 263A was intended to capture that cost.

That this has been a consistent legislative goal is demonstrated by the comment of the House Conference Committee, considering the 1982 amendments that strengthened § 189 (predecessor of § 263A), and describing then-current law:  "The interest that must be capitalized is interest which is attributable to the construction period on any debt incurred or *continued* for the purpose of acquiring, constructing, or *carrying* real property other than low income housing."

---

[21]  DRI carried a great deal of debt in 1996.  It deducted nearly $400,000,000 in interest expense that year.  *See*, DPFUF ¶ 2; Stip. ¶¶ 41, 68.

H.R. Conf. Rep. No. 760 (Part II) at 483 (emphasis added).[22]  DRI is continuing to finance debt

that could be avoided if it no longer "carried" Possum Point Unit 4 and Mount Storm Unit 3, but

instead disposed of them and paid down that debt.

2.      **Section 263A Requires Capitalization of Avoided Interest *Costs*, not**
        ***Expenditures***

Section 263A focuses on *costs* of production.  In fact, § 263A(f)(4)(C) defines production

"expenditures" as "the *costs* (whether or not incurred during the production period) required to

be capitalized under subsection (a)," which in turn requires capitalization of direct costs of the

property as well as the property's allocable share of indirect costs.  Section 263A(f)(2)(ii) then

fixes the amount of capitalized interest as the interest costs that could have been reduced if

"production expenditures" had not been incurred.  Taken together, this means the amount of

avoided interest expense to be capitalized is based upon the underlying costs avoided (and

measured by the production period and relevant interest rate).  The inclusion of capitalized

interest on associated property is completely consistent with measuring this cost.

DRI's contention that the avoided *cost* method deals only with "expenditure of funds,"

was explicitly *rejected* by the United States Supreme Court in *Idaho Power*, where the Court

ruled that an "amount paid out" for purposes of capitalizing depreciation under § 263(a) must be

expansively interpreted, and instead "equates with 'cost incurred.'" 418 U.S. 1, 16 (1974).[23]  So,

_____

[22]  See, Introduction, Parts B and C.

[23]  Section 167 permits a current deduction for depreciation, recognizing that assets are
*consumed* through their use.  When assets are *constructed*, however, deductions are denied for
"any amount paid out for new buildings or for permanent improvements or betterments made to
increase the value of any property or estate."  Sec. 263(a)(1).  This "reflect[s] the basic principle
that a capital expenditure may not be deducted from current income.  It serves to prevent a
taxpayer from utilizing currently a deduction properly attributable, through amortization, to later
tax years when the capital asset becomes income-producing."  *Commissioner* v. *Idaho Power*

too, in § 263A, where "accumulated production expenditures" provide the base amount for

determining avoided interest, and this term is defined as "the *cumulative* amount of direct and

indirect costs...required to be capitalized with respect to the unit of property."  Sec. 1.263A-

11(a).  The fact that production expenditures as defined in the statute *explicitly* includes costs

"whether or not incurred during the production period" clearly supports the notion that

associated property costs should be taken into account.  And rightly so.  Contrary to DRI's

contention that this phrase refers solely to "preparatory costs" incurred before the production

period (*see* DRI Br. at 16), this statutory provision is meant to deal with *interest* costs.  Possum

Point Unit 4 and Mount Storm Unit 3, built with costs incurred long before the production

---

*Co.*, 418 U.S. 1, 16 (1974).  In *Idaho Power*, the taxpayer had removed certain equipment from
their normal income-producing activities and instead used it in the taxpayer's own capital
construction.  The taxpayer sought to take current depreciation deductions on the assets used in
self-construction.  The Court ruled that although § 263(a) specifically requires capitalization of
"amounts paid out," in this circumstance, depreciation *was* an "amount paid out," conceptually
identical to a "cost" of construction of a capital asset, and therefore depreciation costs, if
incurred in making a taxpayer's own capital improvements, were required to be capitalized.  In
the Court's words (*id.* at 11):

> [W]hen the asset is used to further the taxpayer's day-to-day business operations, the
> periods of benefit usually correlate with the production of income. Thus, to the extent
> that equipment is used in such operations, a current depreciation deduction is an
> appropriate offset to gross income currently produced. It is clear, however, that different
> principles are implicated when the consumption of the asset takes place in the
> construction of other assets that, in the future, will produce income themselves. In this
> latter situation, the cost represented by depreciation does not correlate with production of
> current income. Rather, the cost, although certainly presently incurred, is related to the
> future and is appropriately allocated as part of the cost of acquiring an income-producing
> capital asset.

In addition, the Court observed (at 14) "that capitalization of construction-related depreciation
by the taxpayer who does its own construction work maintains tax parity with the taxpayer who
has its construction work done by an independent contractor."  As noted above, Congress was
well aware of *Idaho Power* when it enacted Code § 189 in 1976.

34

period, nevertheless attract avoided interest capitalization when they are taken out of service to facilitate improvement.

DRI simply ignores the *Idaho Power,* statutory, and regulatory definitions of production expenditures as equivalent to economic costs, and instead argues that the amount of avoided interest to be capitalized is defined as: "if the taxpayer had not engaged in the production activity but had instead used the funds expended on that production activity to pay down the taxpayer's debt and thereby reduce the taxpayer's interest costs." (DRI Br. at 19.) As already demonstrated, DRI's approach to avoided costs is unsupported, and unsupportable.

Moreover, the fact that Possum Point and Mount Storm were built prior to DRI's "intention" to upgrade them is completely irrelevant. The avoided cost method is *meant* to ignore subjective intentions. "The application of the avoided cost method does not depend on whether the taxpayer actually would have used the amounts expended for production to repay or reduce debt." Treas. Reg. § 1.263A-9(a).

DRI argues in its brief (ostensibly to address a hypothetical but in reality it describes its own purchase of Kincaid)[24] that the situations are different. DRI claims that when purchasing an asset that *already* requires an improvement, it makes sense to capitalize interest on the adjusted basis of the entire unit of property, because, "if the taxpayer had not made the decision to undertake the improvement, the taxpayer would likely not have expended the [money] to

---

[24] DRI purchased the Kincaid Power Station in 1998, when two units within the station were in need of "major overhauls." DRI was required to, and in fact *did*, capitalize interest on the entire adjusted basis of the facility when it made the improvements. *See* DRI Resp. to Interrogatory No. 1. (Def.'s Exh. 2). Had Kincaid retained the facility and made the improvements *itself*, Kincaid would have been required to capitalize the identical amount of interest on the entire adjusted basis of the facility. Instead, Kincaid sold the facility and paid down its debt – avoiding interest on the *entire adjusted basis* of Kincaid Power Station – one of the economic choices the rule contemplates.

purchase the existing power plant."  (DRI Br. at 32.)  DRI maintains that an improvement must

be "planned" at the time of the original acquisition of the asset for require such capitalization of

interest.  Again, this approach violates avoided cost methodology.  The rules mean to remove a

taxpayer's subjective statement about what it "plans" to do with the property, and *assumes* that if

a taxpayer makes a significant improvement to an asset, and must withdraw it from service to

make that improvement, the taxpayer has chosen not to dispose of that asset but to finance it

while it is upgraded.

Finally, DRI contends there are *no costs* associated with idling Possum Point Unit 4 and

Mount Storm Unit 3 when an improvement is made.  Rather, whatever funds have already been

expended on those units of property "remain invested," regardless of whether an improvement is

made or not.  That is simply not true.  Again, DRI's decision to halt its revenue-producing

generating units has a cost, as does its decision not to sell Possum Point Unit 4 and Mount Storm

Unit 3 and pay down DRI's debt.  As expressed in FAS 34 ¶ 42 (Def.'s Exh. 3), the objective of

measuring the costs of self-constructed assets should be the same as measuring the costs of

purchased assets – "to obtain a measure of cash flow service potential that is supported by the

objective evidence.... The cost of financing the asset during the period of its construction or

production is one of those cost components."

### 3        The property-used-to-produce-property rule *confirms* that associated property costs must attract capitalized income

Consistent with § 263A's purpose of capitalizing interest uniformly among taxpayers

producing the same type of property – regardless of whether they produce property through

indirect or direct borrowing, or whether they self-construct or purchase, Treasury Regulations

§1.263A-11(d) ("property used to produce designated property") requires that a taxpayer

36

producing property include in accumulated production expenditures the adjusted bases of any equipment, facilities, or other similar assets, used in a reasonably proximate matter for the production of a unit of designated property during any measurement period in which the asset is so used. *See*, *also*, § 263A(f)(3). Thus, if a taxpayer used bulldozers and other equipment to self-construct, that taxpayer would be required to capitalize interest on the *entire adjusted basis* of the equipment during the production period. By taking property away from profitable uses and using that property in self-construction, the taxpayer incurs costs for which the regulation seeks to account, by capitalizing the financing costs associated with that property during the production period, and rolling it into the value of the property produced. The associated property cost rule treats identically a taxpayer making an improvement to a unit of property that it removes from service.

Confusingly, DRI argues that *because* the property-used-to-produce property rule achieves "precisely the same result as the associated property rule," (*see* DRI Br. at 12), the associated property rule must be wrong. Attempting to apply the rule *"expressio unius est exclusio alterius,"* DRI argues that Congress viewed the use of property to produce designated property as a special case where the entire adjusted basis of an asset is used to account for capitalized interest – § 263A(f)(3) – and therefore all *other* cases attempting to account for associated property costs are by definition excluded. DRI's interpretation of "*expressio unius est exclusio alterius*" is wrong for three reasons.[25]

First, the statute requires the capitalization of interest on all direct and properly allocable indirect costs of production of property. Sec. 263A(a). Because the combined adjusted bases of

---

[25] Put another way, *nesciunt quid haec verba significent*.

the property used to produce property would not equal the adjusted basis of the unit of property produced (*i.e.*, a $10 million piece of construction equipment will not be *added* to the adjusted basis of a $5 million asset to arrive at a structure with $15 million adjusted basis), Congress wanted to insure that for *purposes of capitalizing interest*, both the *time value* of using the $10 million crane, as well as the *time value* of the idled $5 million structure were both included.  This is elucidated in 1.263A-8(a)(2) that states "*interest* capitalized by reason of assets used to produce designated property (within the meaning of § 1.263A-11(d)) is added to the basis of the designated property rather than the bases of the assets used to produce the designated property." Therefore, Treasury created a special rule to capture those costs.  The fact that Congress and Treasury made a special rule to capture those costs that could otherwise be missed demonstrates that the adjusted basis of the associated property is intended to *attract* capitalized interest, not exclude it by implication.

Second, the property-used-to-produce-property rule is consonant with the purpose of § 263A to account for all indirect financing costs and to treat taxpayers evenhandedly.  The taxpayer producing property by using existing property to construct it, and a taxpayer producing property by improving it, will both account for the same avoided interest on that production.  Both are required to account for the costs of using (or idling) property during production by capitalizing the interest imputed to those costs.

Third, there is nothing in the *statute* itself (§ 263A(f)(3)) that would require interest capitalization on the entire adjusted bases of assets used to produce property, but rather it is the Treasury Regulation §1.263-11(d) that fleshes this out.  There is nothing redundant about making explicit the requirement to capitalize interest on the adjusted basis of the entire unit of

property regarding property-used-to-produce property, as well as for a unit of property temporarily removed from service to facilitate improvement. Although they lead to the same result, they are entirely different situations; and the regulations simply ensure even-handed treatment.

**F.    The Associated Property Regulation Was not Adopted in an Arbitrary and Capricious Manner**

Treasury issued its notice of proposed rulemaking in 1991, and after an extended period, issued final regulations in 1995. *See*, 56 FR 40842-01, 1991 WL 156988 (F.R.); T.D. 8584, 1995-1 C.B. 20. Those regulations clarify how the avoided cost method of determining capitalized interest on property produced is to be applied. The courts are required to defer to the agency's interpretation unless procedurally defective, arbitrary or capricious, or manifestly contrary to the statute. *Mead*, 553 U.S. at 227.

DRI acknowledges that § 1.263A-11(e)(1)(ii)(B) was the result of notice and comment rulemaking, as well as Treasury's grant of authority under § 263A(i), but argues that the rule is invalid simply because in the preamble to the final regulations Treasury "d[id] not provide the explanation of the reasoning leading to the adoption of the rule that is required under *State Farm* for the APA's arbitrary and capricious standard to be satisfied." (DRI Br. at 36.)

This is not the standard. The arbitrary and capricious standard "requires only that the final decision reached by the agency is the result of a process which considers the relevant factors and is within the bounds of reasoned decisionmaking." *Abbott Laboratories* v. *United States*, 84 Fed. Cl. 96, 109 (2008) (internal citation omitted), *aff'd*, 573 F.3d 1327 (Fed. Cir. 2009). Moreover, as stated in *State Farm*, "[W]e will, however, 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned'" (*citing Bowman Transportation,*

39

*Inc.* v. *Arkansas-Best Freight System, Inc.*, *supra*, at 419 U. S. 286.  *See, also, Camp* v. *Pitts*, 411 U. S. 138, 411 U. S. 142-143 (1973) (per curiam)).

This Court's predecessor dismissed our of hand a similar criticism of a regulation promulgated under Code § 994:

> The [APA's] purpose of requiring a statement of the basis and purpose to be published with the regulations is to enable courts, which have the duty to exercise review, to be aware of the legal and factual framework underlying the agency's action. *American Standard, Inc. v. United States*, 602 F.2d 256, 220 Ct.Cl. 411 (1979) citing *SEC v. Chenery Corp*., 318 U.S. 80, 94, 63 S.Ct. 454, 462, 87 L.Ed. 626 (1943). Derived from the very rationale of the requirement is an exception to its overtechnical application. When the basis and purpose of the rule is inherent in the rule and the enabling statute, then no separate statement is required.
>
> As to the merits of plaintiff's procedural claim, the reasonableness of the regulations can be determined judicially notwithstanding the notice of rule making. Clearly the regulations were promulgated in order to implement IRC § 994. Comments to the proposed regulations were submitted, after which a public hearing was held. The regulations were not issued in violation of the APA requirement of a statement of basis and purpose.

*Dow Corning Corp. v. United States*, 22 Cl.Ct. 184, 192 (1990).

As explained exhaustively in this brief, Treasury crafted § 1.263A-11(e)(1)(ii)(B) completely in accordance with Congress's desire expressed in the legislative history: to capture comprehensively the costs of producing, acquiring, and holding property, including interest expense, to treat taxpayers uniformly, and to provide an objective measure of doing so.[26]  The associated property cost rule is a manifestation of that "reasoned decisionmaking."  Moreover, even in the preamble cited by DRI, Treasury *explicitly* considered the remarks of various

---

[26]  DRI does not challenge Treasury's use of a fixed interest rate, nor does it challenge the use of monthly assessment of interest for determining the production period.  These calculations are also a part of the avoided cost method, and also reflect Treasury's attempt to find uniform, objective measures of determining costs.  Just as with the associated property regulation, it is understood that Congress intended Treasury to implement permissible regulations to further the purposes of §263A.

commentators regarding the associated property regulation.  1995-1 C.B. at 26.  In fact, Treasury created a *de minimis* exception to the associated property rule to account for their concerns. Thus, Treasury's adoption of the associated property regulation far exceeds that required under the arbitrary and capricious standard.

**II**

**THE *DE MINIMIS* RULE DOES NOT APPLY**

The Treasury Regulations under § 263A provide a *de minimis* exception to capitalization of interest on associated property.  Section 1.263A-11(e)(2) states that associated property costs will be excluded from accumulated production expenditures:

> [i]f, on the date the production period of the unit begins, the taxpayer reasonably expects that at no time during the production period of the unit will the accumulated production expenditures for the unit, determined without regard to the associated property costs, exceed 5 percent of the associated property costs.

DRI contends that its accumulated production expenditures for Mount Storm Unit 3 qualified for the *de minimis* exception.

On the date the production period began in 1996, DRI reasonably expected the total accumulated production expenditures for the unit would be $11,026,800.00.  Stip. ¶ 52, DRI Br. at 39.  The associated property costs were determined by the IRS to be $131,824,851.00.  (Stip. ¶ 50.)  DRI's estimate on the date that the production period began thus far exceeded five percent of the associated property costs, and the *de minimis* exception clearly does not apply.  DRI argues that based upon an agreement with the IRS in *2007* to treat half the *actual* cost of the improvement as a deductible repair and half as a capital expense (*see*, Stip. ¶ 62, JX 1), DRI is entitled to consider "the estimated cost of the capital portion of the Mount Storm burner" as the figure to be used for *de minimis* purposes – here, $5,513,400.00.  (DRI Br. at 39.)  DRI itself

41

states, however, that it does not dispute that it originally estimated the cost of the burner project to be $11,026,800.00.  (DRI Br. at 40.)  Although the IRS did later agree to "settle" the amount of how much of the burner project would be considered a capital expense (Stip. ¶ 62), that agreement has no effect on the *de minimis* rule.  First, the rule is clear that the costs must be viewed *prospectively* at the time construction begins.  To do otherwise would allow taxpayers to game the system – as DRI clearly attempts to do here.  In fact, the rules governing the production of designated property, Treas. Reg. §1.263A-8(b)(2)(iii), require a taxpayer to "maintain contemporaneous written records supporting the estimates" of the cost and production period of the project, and:

> [i]f the estimates are reasonable based on the facts in existence at the beginning of the production period, the taxpayer's classification of the property is not modified in subsequent periods, even if the actual length of the production period or the actual cost of production differs from the estimates.

DRI admits that when it began production, it estimated the project to be far in excess of five percent of the associated property cost.  (Stip. ¶ 52, DRI Br. at 40.)  That ends the inquiry. DRI's claim that it can readjust its *expected* costs eleven years *after* they occurred is absurd.


## III

### THE CALCULATION OF THE AMOUNT OF INTEREST REQUIRED TO BE CAPITALIZED UNDER § 263A MISTAKENLY OMITTED A PORTION OF THE ADJUSTED BASES OF THE POSSUM POINT AND MOUNT STORM UNITS; DEFENDANT IS THUS ENTITLED TO JUDGMENT FOR THE RESULTING ERRONEOUS REFUND OF TAX AND INTEREST FOR 1996

DRI and the United States agree that § 1.263A-11(e)(ii)(B) requires that interest be capitalized on the entire adjusted basis of associated property.  The IRS ultimately determined

42

that for Possum Point Unit 4, the adjusted basis of the associated property was $9,883,982.00. (Stip. ¶ 23.)  The IRS then determined that the amount of interest to be capitalized based on the applicable regulations was $177,274.00.  (Stip. ¶ 31.)  This was calculated as a function of the adjusted basis of the associated property, the production period, and the applicable interest rate. (Stip. ¶¶ 31, 32, 33.)  At the Appeals stage, the parties agreed that with respect to the value of the cost of replacing the existing burners at Possum Point 4, half would be considered an immediately deductible expense, and half a capital expenditure.   (Stip. ¶ 36.)  Because interest on the associated property cost depends upon the adjusted basis of the associated property – here Possum Point Unit 4 – and *not* the value of the burner project, the amount of properly capitalizable interest *remains* $177,274.00.  This makes sense, because, as discussed above, the associated property rule is meant to capture the avoided interest costs associated with taking the unit of property out of service.  That is a function of time and interest rate that has *nothing to do* with the value of the underlying improvement.[27]  Mistakenly, however, in its calculation of the amount, the IRS capitalized only half of DRI's interest on associated property costs, $88,637.00, a mistake that inadvertently permitted DRI a current expense of the remainder.  The United States filed a counterclaim on October 23, 2009 to recover the erroneously refunded amount of the related tax and interest.  If the Court upholds the regulation, the United States is entitled to repayment of that tax and interest.

Likewise, the associated property for Mount Storm 3 was determined to have an adjusted basis of $131,824,851.00.  (Stip. ¶ 50.)  Utilizing the appropriate production period and applicable interest rate, the IRS ultimately determined that DRI was required to capitalize

---

[27]  Unless the improvement falls under the *de minimis* exception.

$3,152,360.00 in interest.  (Stip. ¶¶ 58, 59, 60.)  Although at the administrative Appeals stage the IRS agreed to treat the underlying cost of replacing the burners to the generator as half deductible repair, half capital expense, this does not change the underlying amount of interest to be capitalized on associated property.  That is a fixed amount with respect to the cost of taking the unit of property out of service during the production period.  In its calculation, however, the IRS mistakenly capitalized only half of the interest on associated property, $1,576,180.00, a mistake that inadvertently permitted DRI a current deduction for the remainder.  The United States filed a counterclaim on October 23, 2009 to recover the erroneously refunded amount of the related tax and interest.  If the Court upholds the regulation, the United States is entitled to repayment of that tax and interest.

CONCLUSION

For the reasons stated herein, plaintiff's motion for summary judgment should be denied, and the United States' cross-motion should be granted, with judgment entered in favor of defendant on its counterclaim.

Respectfully submitted,

s/Carl D. Wasserman
CARL D. WASSERMAN
Attorney of Record
U.S. Department of Justice
Tax Division
Court of Federal Claims Section
P.O. Box 26
Ben Franklin Station
Washington D.C. 20044
202-307-6587


JOHN A. DiCICCO
   Assistant Attorney General
STEVEN I. FRAHM
   Chief, Court of Federal Claims Section
MARY M. ABATE
   Assistant Chief, Court of Federal Claims Section

s/Mary M. Abate
Of Counsel

Attorneys for Defendant


Dated:   July 9, 2010